# EDWIN  R.  CLEAVELAND,  JR.,  *vs.*  MICHAEL  A. MULLIN,  Receiver.

*Payment of Bonus Tax a Condition Precedent to Existence of a Corporation—Allotment of Shares by Corporation to Purchaser Before Payment of Bonus Tax Invalid—Subscriptions to Stock of Corporations to be Formed.*

Code, Art. 81, sec. 88F, provides that every corporation incorporated under any general or special law of the State (except certain classes) shall pay to the State Treasurer a bonus of one-eighth of one per cent on the amount of its capital stock and that no company thereafter incorporated shall have or exercise any corporate powers until said bonus has been paid.  A subsequent Act, passed in 1898, incorporated the Atlantic Trust Co. and directed that when a certain amount of its capital stock shall have been paid in the corporation should be entitled to the powers conferred by the Act.  This company was organized but did not pay the above-mentioned bonus tax until April, 1900.  About a year before that the defendant offered to purchase on certain terms twenty-five shares of stock and the Atlantic Co. accepted the offer and allotted to him the shares, but it did no act to accept defendant's offer after the payment of the bonus tax.  In an action by the receiver of the company to recover from defendant the price of the shares allotted to him, *held*,

1st.  That nothing contained in the charter of the Atlantic Co. prevented the application to it of the general provision requiring all newly formed corporations to pay the bonus tax as an absolute condition precedent to the exercise of any corporate powers.

2nd.  That defendant's offer to purchase the shares was not an unqualified subscription to the stock, but was conditioned upon its acceptance by the Atlantic Co.; that the making of a contract by the acceptance of the offer involved the exercise of a corporate power, and since the company had not then paid the bonus tax it was not authorized to perform this corporate act and its attempt to do so was a nullity, and that consequently no contract had been made creating an obligation on the part of the defendant and the receiver is not entitled to recover in this action.

3rd.  That the fact that after defendant's offer was so made and accepted the bonus tax was paid did not operate to make that agreement binding, because defendant did not subscribe to the stock of a corporation to be formed, but was attempting to make a contract with what was supposed to be an existing corporation.

When parties subscribe to the stock of a corporation to be formed the mutual promises of the subscribers constitute a sufficient consideration for each other, and are continuing offers which become binding contracts with the company, when its incorporation is perfected.

Appeal from Baltimore City Court (DENNIS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Bernard Carter* and *Wm. S. Bryan, Jr.*, (with whom were *Edward N. Rich* and *Jas. E. Godwin* on the brief), for the appellant.

*Alfred S. Niles* and *Wm. L. Marbury* (with whom was *Jos. C. Mullin* on the brief), for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

This suit was instituted by the receiver of the Atlantic Trust and Deposit Company of Baltimore against the appellant to recover the amount of an alleged subscription by the latter to the capital stock of the company. The declaration contains the usual money counts and a special count which sets forth the contract sued on. Eleven pleas were filed. Upon some issues were joined and to others demurrers were interposed. The demurrers were sustained and the case went to trial on the issues of fact made by the other pleas. During the progress of the trial eight exceptions were reserved. Seven of them concern the admissibility of evidence and the eighth relates to the instructions granted and to the prayers for instructions which were rejected by the Court. There are several interesting questions presented on the record, but there is one raised by the ruling on the demurrer to the appellant's *ninth* plea and by the rejection of the appellant's *tenth* prayer which we regard as decisive of the case; and consequently to the consideration of that question this judgment will be limited.

By the *Act of Assembly of 1898, ch. 504,* approved April ninth, 1898, it was provided, that eleven named individuals "and the subscribers to the stock of the corporation hereby

created and their successors and assigns, be and they are
hereby created a body corporate by the name of the Atlantic
Trust and Deposit Company of Baltimore, and by that name
shall have perpetual succession, and shall be competent to sue
and be sued in any Court of law or equity whatever, &c."
By the fourth section of the Act it was enacted: "That the
capital stock of said company shall consist of ten thousand
shares of the par value of fifty dollars each and when the
amount of two hundred thousand dollars shall have been sub-
scribed and fully paid in, the said corporation shall be entitled
to all the powers, privileges and franchises conferred by this
Act, &c."

On the 25th day of May, 1899, the appellant addressed the
following letter to the president and board of directors of the
Atlantic Trust and Deposit Company of Baltimore: "Gentle-
men: I hereby apply for 25 shares of the capital stock of the
Atlantic Trust and Deposit Company of Baltimore at one hun-
dred dollars per share. If any of said shares are allotted to
me, I do hereby agree to make payment therefor as and when
called upon so to do by said company." On June 10th of
the same year the following reply was mailed to the appellant:
"You are hereby notified that you have been allotted 25 shares
of the capital stock of the Atlantic Trust and Deposit Com-
pany of Baltimore, under the terms of your letter of subscrip-
tion. A call of twenty-five per cent of the capital and surplus
has been made, payable at the office of the company in the Atlan-
tic Trust Building, on or before the 20th day of June, 1899. * *"
Six days afterwards, or on June 16th, the appellant wrote a
letter to the president of the company in these words: "When
I subscribed for 25 shares of stock in your company I did it
for investment, expecting to receive some money (which has
failed to materialize) to pay for it when due, but find it will be
impossible, so I ask you as a personal favor to cancel my sub-
scription. While this step is necessary I regret very much to
have to do it, &c., &c."

By the *Code of Public General Laws*, Art. 81, sec. 88F, it is de-
clared: " Every corporation incorporated after the twenty-first

day of March, 1894, under any general or special law of this State, except cemetery companies, companies created for purely benevolent and charitable purposes, railroad companies and building or homestead associations incorporated under Art. 23 of the Code of Public General Laws, title, ' Corporations ' sub-title, ' Provisions for the formation of corporations,' sec. 18 (class five), shall pay to the State Treasurer for the use of the State a bonus of one-eighth of one *per centum* upon the amount of capital stock which said company is authorized to have * * * * * said bonus upon the original capital stock shall be due and payable upon the incorporation of said com-pany * * * * * and no company as aforesaid which shall be incorporated after the twenty-first day of March, 1894, shall have or exercise any corporate powers until said bonus has been paid to the State Treasurer." By *sec. 88G,* it is pro-vided that if any company shall fail or neglect for the space of two months to pay the bonus tax, the comptroller shall cause suit to be instituted therefor ; and by *sec. 88I,* it is declared that if after suit brought and judgment rendered for the amount of the bonus due, the company shall remain in default for the space of two years " such failure and neglect shall be deemed to amount to and shall constitute a forfeiture of the charter of such corporation, and said charter shall be decreed to be so forfeited and annulled *ipso facto.*"

Without pausing to inquire into the causes which led to that result, it is sufficient to say the Atlantic Trust and Deposit Company became insolvent, and upon a bill being filed in equity against it the appellee was, on January the twelfth, 1901, appointed receiver to take possession of its books and assets, and on March the twelfth, the receiver was directed by an order of Circuit Court No. 2, to institute suits for the col-lection of the unpaid subscriptions to the company's capital stock. Under the last named order the pending suit was brought.

The appellant's *ninth* plea avers : that the bonus tax re-quired by law to be paid by the Atlantic Trust and Deposit Company was not paid until the twelfth day of April, nineteen

hundred, and that no act was done and no proceedings taken by the Atlantic Trust and Deposit Company after the payment of said bonus tax, to accept the appellant's alleged subscription or to allot the shares in the appellant's said alleged contract mentioned, to the appellant. The demurrer to that plea admitted those averments to be true; and the demurrer was sustained. The appellant's *tenth* prayer reads: That the plaintiff (the receiver), is not entitled to recover, because the Atlantic Trust and Deposit Company did not pay the bonus on capital stock required of it under the provisions of *sec. 88, Art. 81, Code of Public General Laws,* until the seventeenth day of April, 1900, and no act to accept the defendant's subscription or to allot him any shares of the capital stock of the Atlantic Trust and Deposit Company was done by the said corporation after the payment of the said tax. That prayer was rejected.

The precise question presented by the demurrer to the *ninth* plea and by the appellant's rejected *tenth* prayer is this: Was the Atlantic Trust and Deposit Company, at the time the appellant offered to subscribe to its capital stock, capable in law of making any valid contract because of the non-payment of the bonus tax; and did it after the payment of that tax accept the appellant's proposal to subscribe?

Now, it is obvious at a glance—it is self-evident—that the appellant's letter of May the twenty-fifth, 1899, hereinbefore transcribed, was a mere offer to subscribe to the capital stock. It was not, and in the nature of things it could not be, a definite unqualified subscription to twenty-five shares of stock, for the subscription was, as offered to be made, wholly dependent on an acceptance and allotment before it could become an actual subscription at all. Without an acceptance and an allotment by the company there was, and there could have been, no binding contract to subscribe. An acceptance of the offer and an allotment of the shares to be valid could only have been made by some one capable in law to accept and to allot. In a word, there must have been two parties competent to contract before there could be a contract. Was the Atlantic Trust and Deposit Company capable in law of accepting the

appellant's offer and of alloting the shares on June the tenth, 1899—the date when it is alleged the allotment was made? The answer to that question must be sought in the provisions of the statutes to which reference has already been made.

Whatever may be the terms employed in the *Act of 1898, ch. 504,* under which the Atlantic Trust Company was organized, they are to be read and interpreted as subordinate to and not as a repeal or a modification of the broad and comprehen-. sive provisions of secs. *88F et. seq.* of *Art. 81.* of the Code. And this is so because the Legislature has declared that it should be so ; and because even if there were a doubt as to whether or not there existed a conflict between the company's charter and the general law, that doubt would be resolved against the corporation according to the familiar principle that a surrender of the power of the Legislature in any matter of public concern can never be presumed from uncertain or equivocal expressions. *L. & N. R. R. Co.* v. *Com. of Ky.,* 161 U. S. 685.

"Every corporation," says *sec. 88F,* "incorporated under any general or special law of this State," except those enumerated, shall pay the bonus tax, "and *no* company which shall be incorporated * * * * shall have or exercise *any* corporate powers until said bonus has been paid to the State Treasurer." Consequently when without attempting to repeal. or modify this comprehensive provision, the General Assembly adopted the *Act of 1898, ch. 504,* wherein it spoke of the "*corporation hereby created,*" and wherein it declared that the persons named in the Act and their successors and assigns "*are hereby created a body corporate,*" it must be understood that *sec. 88F* and the others heretofore cited, are to be read into the *Act of 1898* and that the terms of the latter must be qualified and narrowed by the words and the intent of the former. This must be so unless the settled policy of the State to prohibit *any* corporation from *having* or *exercising any* corporate powers until the bonus tax is paid, was designed to be suspended or repealed as. to the Atlantic Trust Company by the phrases quoted from its charter. But the *Act of 1898* dis-

tinctly negatives the existence of such a design because in its eleventh section it is declared that the Atlantic Trust Company shall be subject at all times to all general laws applicable to associations of a similar character. It is clear, then, that nothing contained in the charter of the trust company can be taken to limit or restrict the force and the application of the general provisions of *Art. 81* of the Code. To those provisions attention must now be directed.

Looking alone to *secs. 88F, G, H, and I,* and the terms used therein, there ought not to be any reasonble doubt as to their meaning and effect. *Sec. 88F* imposes the tax, and prohibits the company liable to pay it, from *having* or *exercising any* corporate powers until the bonus has been paid to the State Treasurer. *Sec. 88 G.* makes it the duty of the Comptroller to sue for the tax after the company is in default for two months and *sec. 88I* declares that a failure to pay the tax for two years shall constitute a forfeiture of the charter. *Sec. 88F* prescribes the payment of the bonus as a condition precedent to the possession or the exercise by any corporation, other than the excepted classes, of *any* corporate powers. No company "shall have," that is, possess, "or exercise," that is, use, "*any* corporate powers until said bonus has been paid." It would be difficult to frame a more emphatic or sweeping condition precedent. The fact that the company may be sued by the State for the tax does not render the condition less efficacious, because that provision was inserted for the benefit of the State and not to relieve the company from the antecedent prohibition. Nor does *sec. 88I* neutralize or modify *sec. 88F.* The declaration in *sec. 88I* that a default for two years shall be deemed to amount to and shall constitute a forfeiture of the charter does not mean that a corporation which during that period has neglected to pay the tax still had had a legal existence, or that it had had, or could have exercised, any corporate powers. The effect of the section is to hold the charter suspended for two years, during which time, by paying the tax, the company could clothe itself with the corporate powers named in its charter;

but after the lapse of which period every right to organize un-
der the charter should cease and be at an end. Nothing in
any of the sections of *Article 81* of the Code qualifies the im-
perative condition imposed by *sec. 88F.*

That *sec. 88F* imposes a condition precedent is no longer
an open question in this State. *Md. Tube Works* v. *West End
Imp. Co.,* 87 Md. 215. "There is certainly no doubt that
where a corporation is created by statute, or under a general
statute  *  *  *  which requires certain acts to be done *be-
fore it can be considered in esse,* there those acts must appear
to have been done in order to establish the corporate exist-
ence." *Lord* v. *Essex Bldg. Assn.,* 37 Md. 325. No less
emphatic is the case of *The Franklin Fire Ins. Co.* v. *Hart,* 31
Md. 59. By the charter of the insurance company it was pro-
vided that ten named persons "and the subscribers to the
stock of the company and their successors shall be and they
are hereby declared to be a body corporate by the name," &c.,
yet, because by a subsequent section it was declared that as soon
as three thousand shares are subscribed and paid or secured to
be paid, the company shall be competent to transact all kinds
of business for which it was establishd, it was held that the
manifest design of the charter was not simply that the com-
pany should not commence its businsss, but that the *corpora-
tion should not come into existence* until three thousand shares
of the capital stock had been subscribed and paid, or secured
to be paid; and that until that condition was complied with the
company had no legal being. See *Tagart* v. *W. Md. R. R.
Co.,* 24 Md. 563; *Plank Road Co.* v. *Hoffman,* 9 Md. 569;
*Bonaparte* v. *Lake Roland Co.,* 75 Md. 347.

Inasmuch, then, as the payment of the bonus tax was a con-
dition precedent to the possession and the exercise of *any* cor-
porate powers ; and inasmuch as the acceptance of an offer to
subscribe to the company's capital stock, and the allotment of
the stock amongst the proposed subscribers were essentially
corporate acts, because both were necessary to the consum-
mation of a contract between the subscriber and the company,
it is obvious that prior to the payment of the bonus tax on

April the twelfth, 1900, the Atlantic Trust Company was without authority to accept a proffered subscription or to make an allotment of stock amongst persons offering to subscribe therefor ; and the attempted acceptance and allotment on June tenth, 1899, ten months before the tax was paid and therefore ten months before the company came into legal existence, was a sheer nullity. Being a nullity no contractual obligation arose and the appellant was in no way bound to pay for the twenty-five shares of stock for which in his letter of May the twenty-fifth, he offered to subscribe, unless *after* the payment of the bonus tax, and, therefore, *after* the corporation actually be-came a legal entity and was clothed with corporate powers including the power to accept offers to subscribe to its stock, the appellant had by his own acts or conduct recognized himself as, or asserted that he was, a stockholder and the trust company had dealt with, or treated, him as such. But this alternative is out of the case, for not only is there no evidence to sustain it, but the clear and uncontroverted fact is distinctly to the contrary. It affirmatively appears that no action was ever taken by the officers or directors of the trust company looking to an acceptance of the appellant's offer to subscribe, other than the action of June the tenth, 1899, when the company had no authority to make any contract at all ; and it also appears that appellant's letter of June the sixteenth, cancelling his offer to subscribe was in the possession of the company and was attached to the notice of allotment, and that upon the latter was endorsed the word "*returned.*" And this is the situation which existed when the receiver was appointed. No effort had been made to collect from the appellant any instalment of his alleged subscription after the return of the notice of June the tenth, or after the date of his letter of June the sixteenth. In the face of these undisputed facts it has not even been suggested, much less could it be successfully contended, that *after* the corporation became a legal entity by the payment of the bonus tax in April, 1900, there was any act done by it which converted the appellant's withdrawn offer to subscribe into a binding contract of subscription.

It is, however, objected that inasmuch as before this suit was brought the bonus tax had been paid whereby what was prior thereto *not* a corporation became a corporation, the subscriptions to the capital stock antecedently made ripened into binding obligations when the corporation did come into existence. This proposition is stated in the appellee's brief in these words : "And however it may be as to contracts or attempted contracts with third parties, it is well settled in this State that a *subscription to the capital stock* of a corporation made prior to the coming into existence of the corporation will become binding when the corporation does come into existence, and that action may be maintained by the corporation upon such subscription." To sustain this the case of *Hughes* v. *Antietam & Mfg. Co.*, 34 Md. 325, was cited. But it will be observed that there is a clear distinction between the proposition stated in the brief and the one which must be upheld before this suit can be maintained. A subscription to stock to be valid must be a contract between parties competent to contract. If invalid when made by reason of the want of competent parties to make it, it cannot *become* valid or binding by the mere subsequent creation of a party which, when created, would be competent to contract. The contention in the case at bar tacitly concedes the invalidity of the subscription *when made*, but asserts that the formation of the corporation *afterwards* converted what was originally invalid into a binding obligation. It is true that when subscriptions are made *to form* a corporation and to take stock therein the contract is made by the subscribers *with each other*, the consideration of which is the right to a given number of shares upon the incorporation of the company, and the subscriptions constitute a continuing offer to the proposed corporation, that ultimately ripens upon acceptance after an incorporation is perfected, into a consummated contract. It is because *such* subscriptions, that is, those made in anticipation and for the purpose of forming a corporation, are binding between the co-subscribers that one or more of the co-subscribers cannot be discharged therefrom without the assent of the others. *Ang. & Ames on Corps.*,

sec. 523. In the case of *Hughes* v. *An. Mfg. Co., supra,* it appeared that articles of incorporation were framed under the general incorporation law, and appended to the certificate were the subscriptions of Hughes and the other projectors of the company. Those subscriptions were thus made prior to but in contemplation of becoming incorporated. In an action brought by the company *after* its incorporation to compel Hughes to pay for the shares subscribed for *before* the incorporation of the company, it was contended that the subscription was not binding because the law under which the company was formed did not require or contemplate any subscriptions *prior* to the *factum* of incorporation ; and because a subscription thus made stood on a different footing from one made under an Act passed by the Legislature wherein provision was made for the taking of subscriptions by commissioners or persons named in the statute. This Court proceeded to show that there was no difference between subscriptions made in contemplation of an incorporation under the general law and those made in contemplation of the granting of a charter by the General Assembly. "In each case," it was said, "the contract is made by the subscribers with each other, the consideration of which is the right to a given number of shares upon the incorporation of the company, whether it be under a special or a general Act of the Legislature. And hence in the several States where this question has arisen upon subscriptions to a certificate or articles of association, formed for the purpose of being incorporated under a general corporation law, it has been held that such subscriptions are binding and may be enforced after the organization of the company." *34 Md. 325.* The ruling thus made whilst undoubtedly sound and in accord with well considered precedents, has no application to this case for the very obvious reason that the subscriptions and the offers to subscribe to the stock of the Atlantic Trust Company were not made either in contemplation of a charter being granted by the General Assembly or in contemplation of an incorporation under the general law ; but all were made, or the offers to subscribe were based upon the distinct assumption or theory

that there was then in existence a created, subsisting body corporate, itself capable of entering into valid contracts with subscribers to its capital stock. There was no contract by the subscribers with each other; but there were attempts to make separate contracts between the company and each subscriber, though under the positive provisions of the Code, the company did not have and could not exercise *any* corporate power whatever and was not legally in existence as a corporation at the time.

Entertaining these views it of course follows that there was error committed in sustaining the demurrer to the *ninth* plea and in refusing to grant the appellant's *tenth* prayer, as well as in granting the appellee's *first* instruction which wholly ignored this question. The judgment will be reversed because of the errors indicated; and as no recovery can be had against the appellant, a new trial will not be awarded.

> *Judgment reversed with costs · above and below, without awarding a new trial.*